## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **United States of America ex rel.** | ) | |
| **CEDRIC CAL (B-54397),** | ) | |
| | ) | |
| Petitioner, | ) | Case No. 14 C 3834 |
| | ) | |
| vs. | ) | |
| | ) | Case No. of State Court Conviction |
| | ) | 92 CR 10385 |
| **WARDEN TARRY WILLIAMS[1],** | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| Respondents. | ) | |

### MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

NOW COMES Petitioner, CEDRIC CAL, by and through his counsel, SHOBHA L.

MAHADEV, ALISON R. FLAUM, and SCOTT F. MAIN, CHILDREN AND FAMILY

JUSTICE CENTER, NORTHWESTERN PRITZKER SCHOOL OF LAW and, with leave of

this Court, hereby submits this Memorandum of Law in support of his Petition for a Writ of

Habeas Corpus. In support of his Petition, Petitioner states as follows:

### INTRODUCTION

Cedric Cal is an innocent man who was wrongfully convicted on several charges related

to a shooting that occurred in Chicago on April 21, 1992. No physical evidence of any kind has

ever linked Mr. Cal to the shooting, and no confession or independent eyewitness has ever

inculpated him. Rather, Mr. Cal's 1994 conviction rests entirely on the testimony of the

surviving victim of the shooting, Willie Johnson. Mr. Johnson, however, has now thoroughly and

credibly recanted that testimony, stating repeatedly, and under oath, that Mr. Cal and his co-

defendant, Albert Kirkman, are innocent – just as Mr. Cal and Mr. Kirkman have maintained for

---

[1] Mr. Cal is now housed at Hill Correctional Center, where the warden is Stephanie Dorethy.

the last 24 years. Specifically, in a state court post-conviction evidentiary hearing, Mr. Johnson stated that Mr. Cal and Mr. Kirkman were not involved in the shooting in any way. Mr. Johnson has provided a compelling explanation for both his original false testimony and his decision to recant and tell the truth: the actual perpetrator was Keith Ford, a high-ranking gang member and drug dealer who Mr. Johnson feared greatly at the time of the shooting and the original trial. Mr. Johnson, who has since moved far away from Chicago, no longer fears Mr. Ford and, as he explained under oath to the post-conviction court, now feels able to come forward with the truth. Moreover, Mr. Johnson's recantation has been corroborated by other witnesses to whom he had long ago confided the truth.

Mr. Johnson has a significant stake in seeing the true perpetrators of the shooting prosecuted and has no reason to falsely testify in support of Mr. Cal or Mr. Kirkman. The record establishes that Mr. Johnson sustained serious injuries in the 1992 shooting, as well as the loss of his close friends and associates – indeed one of the victims was Mr. Johnson's first cousin and good friend. Mr. Johnson testified at the evidentiary hearing in this matter, that, at the time of the shooting, he viewed Mr. Cal and Mr. Kirkman as his enemies. Finally, as discussed more thoroughly below, he has stood by his recantation despite being charged with perjury by the State after giving his exonerating post-conviction testimony. (Notably, Mr. Johnson was prosecuted under a theory of "inconsistent sworn statements" – the State took no position regarding which of Mr. Johnson's conflicting statements is, in fact, the truth.)

Thus, in light of Mr. Johnson's recent testimony and the lack of any other evidence connecting Mr. Cal to the crime, this case presents the unusual situation in which no evidence exists today to support Mr. Cal's conviction and continued incarceration. Mr. Cal's continued incarceration, therefore, despite strong evidence of his factual innocence, constitutes a due

process violation as well as a violation of Mr. Cal's Eighth Amendment rights. Moreover, under

any theory of this case, one fact is inescapable: Mr. Johnson has lied, at some point in time,

under oath. While Mr. Cal maintains that no reasonable fact-finder could credit Mr. Johnson's

original testimony over his extensive and corroborated recantation, a due process violation exists

in either event as it is uncontested that Mr. Cal's conviction rests solely on testimony that has

been called into serious doubt. Therefore, this Court should grant Mr. Cal a writ of habeas

corpus.


### STATEMENT OF FACTS

### I.     Trial Evidence

On April 21, 1992, at 9:54 p.m., Cedric Herron, Sammy Walker, and Willie Johnson

were shot on the 900 block of Harding Avenue, near the corner of Harding Avenue and Augusta

Boulevard in Chicago. Trial Record (hereinafter "Tr. R.") D41, D43-44. Herron and Walker were

killed; Johnson survived, but sustained nine gunshot wounds. Post-Conviction Record

(hereinafter "PC R.") L24. In February 1994, Cedric Cal and Albert Kirkman were tried and

convicted of two counts of first-degree murder, one count of aggravated battery with a firearm,

and one count of attempted first-degree murder. Tr. R. D11-13; F85-90. Cal and Kirkman, who

were both seventeen years old when the shooting occurred, were sentenced to mandatory natural

life imprisonment without the possibility of parole, as required by Illinois law at the time. Tr. R.

G14-20.

### A.     Willie Johnson Testifies that the Shooting Followed a Fight Regarding His Sister

At Cedric Cal's 1994 trial, the State's entire case rested on testimony from the sole

surviving victim, Willie Johnson – testimony that Johnson, despite his grievous injuries and the

loss of his two close friends, seemed reluctant to provide. Indeed, Johnson failed to appear at trial despite having been subpoenaed; a warrant had to be issued for his arrest before he finally appeared to testify. Tr. R. C3. Johnson, who was on parole for a prior narcotics conviction just a week prior to the trial, ultimately testified that, on the afternoon of the shooting, he was at home at the apartment he shared with his mother at 950 North Harding with his then-girlfriend, Latrese Buford. Tr. R. D41, D43-44. According to Johnson, his sister, Latanya Johnson, came home upset about something that had happened between her and a man named Keith Ford, who lived nearby at 921 North Harding. Tr. R. D44-45, D72, D90. Willie Johnson testified that he went outside to look for Ford, who he found standing outside near Ford's house with five other men, including Cal and Kirkman (who Johnson knew as "Duke"). Tr. R. D45, D68-69.

Johnson said that he spoke with Ford and a fight eventually broke out between Johnson and the other men. Tr. R. D46, D69, D100-01. Johnson testified that about five minutes after the fight broke out, Cedric Herron and Sammy Walker arrived and joined in. Tr. R. D46-47. The fight lasted another ten to fifteen minutes before it concluded. Tr. R. D47-48. According to Johnson, he then went home while Herron and Walker left; he remained at the house until they returned at approximately 10:00 p.m. Tr. R. D48-49, D74-75.

### B. Latrese Buford Contradicts Johnson's Version of Events; Testifies that Keith Ford Told Johnson that Further Association with Walker and Herron Could Be "Dangerous"

The story that Johnson told at trial about the events leading up to the shooting differed significantly from the story told by his girlfriend, Latrese Buford. While Johnson's story involved a fight over his sister Latanya, Buford testified that this fight was instead based on a drug dispute. Specifically, Buford testified that sometime after 5:00 p.m. on the day of the shooting, she and Johnson witnessed an individual, who they knew worked for Cedric Herron,

selling drugs near 920 North Harding. Tr. R. E11-14, E16, E26. Shortly thereafter, Buford testified, she witnessed Keith Ford and another man drive up in two "Astro" vans. Tr. R. E15, E27. Eight to ten men got out of the vans and started a fight with Herron's "worker" – that is, the person who had been selling drugs on Herron's behalf. Tr. R. E16. Buford testified that she saw Kirkman in the area but that he was not one of the men involved in the fight; she did not recall seeing Cal in the area. Tr. R. E29-30. Buford also testified that Herron and Walker showed up during the fight, that Herron told Ford to call off his men, and that the fight broke up. Tr. R. E16, E33.

Buford testified that, immediately after this fight, she and Johnson were walking home when Ford joined them and warned Johnson that it "could be dangerous being around Cedric [Herron]" because he "didn't grow up over there and didn't belong over there so he couldn't be making any transactions or making any money over there." Tr. R. E18. Buford stated that Ford suggested that Johnson talk Herron out of selling drugs on Ford's block because it would be "dangerous" for Johnson "to be around somebody [he knew] was doing wrong." Tr. R. E35. According to Buford, in response to this threat, Johnson protested that he, "ain't in it." Tr. R. E35. Buford herself also pleaded with Ford that Johnson should not be blamed for Herron selling drugs in Ford's territory as Johnson "was not in it," that he could not "pick his friends because he grew up with Cedric [Herron]," and further, that she would see to it that Johnson stayed away from "all of you." Tr. R. E35. When they returned to Johnson's house, Johnson stayed outside and spoke to Ford for an additional ten to fifteen minutes; Johnson and Buford then remained in the house until shortly after 10:00 p.m. Tr. R. E19-E20.

5

### C. The Shooting Occurs Outside Johnson's Apartment Not Long After the Threat From Ford; Johnson Later Identifies Cal and Kirkman as the Shooters

Sometime around 10:00 p.m., Herron and Walker returned to Johnson's house. Tr. R. D48-49, D74-75, E20-21. Johnson testified that five to ten minutes after he went outside to speak with Herron and Walker, two men approached him from behind and pointed guns at them. Tr. R. D49, D51, D75, D79, D96. Johnson was shot in the right wrist, upper left arm, both legs, his lower left leg, and his testicles. Tr. R. D52-53. Johnson testified that he saw the two shooters' faces as he lay on the ground. Tr. R. D54, D97-98.

Shortly after the shooting, Johnson spoke with detectives at the hospital, while being prepared for surgery. Tr. R. D57-58, D133-34. Johnson described both of the shooters as wearing "dark" clothing and said that he recognized one of them as "Duke," who drove a white four-door Oldsmobile. Tr. R. D58-60, D83, D100, D135, D162. At 1:15 a.m., police who were patrolling the area surrounding 900 North Harding spotted a white Oldsmobile driven by Kirkman. Tr. R. D196-98. Cal was the passenger in the vehicle. Tr. R. D198. Officers confirmed that Kirkman's nickname was "Duke" and then arrested both Cal and Kirkman. Tr. R. D199-200.

Around 1:30 a.m., police returned to the hospital to show Johnson a photo array they had created. Tr. R. D138-39, D155. From the array of five photographs, Johnson selected the photographs of Cal and Kirkman and identified them as the two shooters. Tr. R. D139-41.

### D. Defense Witnesses Discredit Johnson's Identification of Cal and Kirkman and Undermine the State's Case

At trial, the defense presented two witnesses who cast doubt on the reliability of Johnson's identification of Kirkman and Cal as the two shooters. Defense witness John Sylvester testified that, approximately one month after the shooting, Johnson told him that Cal and Kirkman were not the individuals who had shot him. Tr. R. E42. Secnoba Comb, who lived near

the scene of the shooting, testified that she went outside minutes after the shooting to see what had happened. Tr. R. E48-49, E53-54. Comb testified that within three to four minutes of the shooting, she and her grandchildren left her house and crossed the street toward the crime scene when she saw Cal, who approached them, also walking toward the crime scene, from across the street. Comb testified that Cal remained on the street for approximately 45 minutes with her, watching police secure the area and remove the bodies. Tr. R. E50-51, E57.

### E. No Other Evidence Links Cal and Kirkman to the Crime

At Cal's trial, the State's entire case rested on Willie Johnson's eyewitness testimony. Tr. R. D40-207. There were no weapons recovered, no physical evidence recovered was connected to Cal or Kirkman, and there was no DNA evidence. Several other witnesses testified for the State, but aside from Johnson, no other witnesses provided evidence or testimony inculpating Cal or Kirkman.

### Post-Conviction Evidence

#### A. Willie Johnson Recants the Testimony that Had Provided the Sole Inculpatory Evidence Against Cedric Cal

Nearly twenty years after he originally testified in court and identified Cal and Kirkman as the individuals who shot him and killed his friends, Willie Johnson testified at a state post-conviction proceedings as a witness for Cal and Kirkman. Specifically, Johnson testified that, at the time of the shooting, Cal and Kirkman were enemies of his, due to a conflict over drug turf. PCR R. L21-22, L41. He testified that Cal and Kirkman had worked with Keith Ford selling drugs on Harding Street, while Johnson had worked with Cedric Herron selling drugs in the same area. PC R. L41. Johnson echoed his trial testimony that there was a fight on Harding on the day of the shooting, but made clear that Cal and Kirkman were not present during the fight. PC R. L44-45. At the evidentiary hearing, Johnson testified that he saw the faces of both shooters,

recognized both men, but only knew the name of one – Keith Ford. PC R. L28-29. He further testified that neither Kirkman nor Cal was the other shooter. PC R. L28-29.

Johnson further testified that, while he was awaiting surgery after the shooting, police showed him photographs of Cal and Kirkman, whom Johnson identified as the shooters in order to protect himself and his family from Keith Ford. PC R. L32-33, L49. According to Johnson, Ford had been threatening his mother and sisters, and Johnson feared him. PC R. L33, L50, L62. He testified that Ford had made it clear to him "what [Ford] would do to [Johnson's] people if [he] implicated him in any way." PC R. L53. Johnson remained afraid of Ford in the lead-up to the trial, at which he tried to avoid testifying. PC R. L34. At the evidentiary hearing, he testified that he wanted to be truthful at trial, but that he was too afraid of Ford at that time. PC R. L35.

Although Johnson acknowledged that he had waited 17 years to come forward with the truth, he testified that he had not done so earlier because, for many years, he was afraid for his life and continued to fear Ford. PC R. L37, L62. Johnson explained that after the shooting, Johnson's mother and sisters continued to live on the same block as Ford, and Johnson was afraid that something would happen to them if he identified Ford as one of the shooters. PC R. L62. Johnson also explained that by the time of the evidentiary hearing he no longer felt afraid of Ford as he had moved far away from Chicago and his mother had passed away . PC R. L 63, L78. Additionally, Johnson felt further reassured because he had been told by Ray Longstreet, a "well-known man in the[] streets" that he should "do the right thing," which he understood to mean that "if he knew [Cal and Kirkman] didn't do [the crime]," he should tell the truth about what had happened. PC R. L77-78.

### B.  Latrese Buford Corroborates Johnson's Fear of Ford at the Time of the Shooting and Reluctance to Identify the True Perpetrator

Latrese Buford, Johnson's former girlfriend, who was employed in the security field and was in the process of applying to the Cook County Sheriff's Office at the time of the evidentiary hearing, also corroborated his recantation. PC R. P16. Buford testified that she was inside Johnson's house at the time of the shooting, and ran outside after she heard Johnson say that he was "hit." PC R. P30. Buford testified that she did not see the shooters, but she did see an "Astro" van driving away from the area. PC R. P30. (Over defense counsel's objection, Buford was prohibited from testifying that Ford drove an "Astro" van. PC R. P31, P68. Defense counsel submitted an offer of proof stating that Buford would have testified to this effect, had she been permitted to do so. PC R. C70-71.)

After being questioned by police about the shooting, Buford went to the hospital to see Johnson, who was in the emergency room. PC R. P34-36. Buford testified that Johnson was reluctant to tell her who had shot him, said that he feared for their safety, and urged her not to talk to anyone about what had happened. PC R. P42-43. Buford was prohibited from testifying about the reputations of Ford, Kirkman, and Cal at the time of the shooting; however, defense counsel submitted an offer of proof stating that Buford would have testified that she knew Ford to be a drug dealer and gang leader, while Cal and Kirkman were considered "neutral" or "neutrons," meaning they were unaffiliated with any particular gang. PC R. C70-71.

At the time of the shooting, Buford worked at a soul food restaurant with Johnson's mother and sisters. PC R. P19. She testified that when she returned to work after the shooting, she began receiving threatening phone calls and visits from people asking about Johnson. PC R. P43-44. After Buford stopped working at the restaurant, Johnson's mother told her that she continued to receive threatening calls asking about Johnson. PC R. P43-44. Johnson believed

these calls to be threats from Ford. PC R. L65-66, P43-44. Buford testified that Johnson moved

in with her after the shooting because he was afraid for his life. PC R. P43. Buford further

testified that, before the start of trial, a Cook County prosecutor talked to her and asked her if she

thought Johnson would show up for trial and whether he was going to change his testimony. PC

R. P54.

### C.   The State's Witness is Unable to Provide an Alibi for Keith Ford for the Night of the Shooting

The State called Lilian Rivera, ostensibly to establish an alibi for Keith Ford at the time

of the shooting, but Rivera was unable to testify that Ford was at her house at that time; rather,

she could only be certain that Ford had visited her home – just blocks from the murder scene – at

some time on the night of the shooting: either at 9:00 p.m., 9:30 p.m., or 10:00 p.m. PC R. P83-

91. In a statement to police taken the day after the shooting, Rivera stated that Ford arrived

around 9:00 p.m. and left not long after; the shooting occurred at approximately 10 p.m. PC R.

P88-90. Rivera had also made conflicting statements about the number of people present at the

house; she testified at the evidentiary hearing that Ford had arrived with another person, but told

investigators in 2010 that Ford arrived with two other men, instead of one. PC R. P89, 113-14.

On July 15, 2011, in an oral ruling, the circuit court denied Cal's post-conviction petition

based on actual innocence. PC R. R2-9.

## PROCEDURAL HISTORY

### I.   Cedric Cal's Trial

Cedric Cal's jury trial began on February 8, 1994, in the Circuit Court of Cook County

before the Honorable Daniel Kelley. Tr. R. D1. The jury returned its verdict of guilty on two

counts of first-degree murder, one count of attempted murder and one count of aggravated

battery with a firearm on February 10, 1994. Tr. R. F86. On March 24, 1994, Cal was sentenced

to natural life for the two first-degree murder convictions – a mandatory sentence at the time,

under Illinois law – and a concurrent term of 30 years' imprisonment for aggravated battery with

a firearm. Tr. R. G18-19.

## II.    Direct Appeal

On direct appeal, Cal raised one ground for relief: that the surviving victim's out-of-court

and in-court identification should have been suppressed where Cal's arrest lacked probable cause

and the identification lacked an independent basis. The Illinois appellate court affirmed Cal's

conviction in an unpublished order on March 26, 1996. *People v. Cal*, No. 1-94-1158 (Mar. 26,

1996). The Illinois Supreme Court denied leave to appeal on October 6, 1996.

## III.    Post-Conviction Petitions and Appeals

Cal filed three *pro se* petitions for post-conviction relief following his direct appeal in

1996, 1998 and 2005. All three petitions were dismissed. His 1996 and 2005 *pro se* post-

conviction petition dismissals were affirmed in unpublished orders in 1997 and 2006

respectively. *People v. Cal*, No. 1-05-0675 (1st Dist. Sept. 26, 2006); *People v. Cal*, NO. 1-97-

0901 (1st Dist. Oct. 24, 1997). Cal did not appeal the dismissal of his 1998 post-conviction

petition.

On December 21, 2009, Cal filed a motion for leave to file a successive post-conviction

petition based on actual innocence – his first counseled petition. Without objection from the

State, the circuit court docketed the petition for an evidentiary hearing. On July 15, 2011, the

circuit court issued an oral ruling denying the petition. PC R. 2-9. The appellate court affirmed

this denial in an unpublished order. *People v. Cal*, No. 1-11-2354 (1st Dist. May 28, 2013).

Following the appellate court's denial, the Illinois Supreme Court issued an order directing the

appellate court to vacate and reconsider in light of *People v. Coleman*, 2013 IL 113307, which addressed the proper state law standards to be applied to post-conviction claims of innocence. The appellate court again affirmed the ruling. *People v. Cal*, No. 1-11-2354 (1st Dist. Dec. 17, 2013). Cal's subsequent petition for leave to appeal to the Illinois Supreme Court was denied on March 26, 2014.

Cal filed a final post-conviction petition on June 13, 2013, raising the issue that his mandatory life without parole sentence, imposed while he was a juvenile, violated the Eighth Amendment and the U.S. Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012). On February 16, 2018, as a result of that petition, Mr. Cal was given a new sentence of 60 years on the two counts of first-degree murder. On the State's motion, the court dismissed the counts relating to the shooting of Willie Johnson and vacated the sentence of aggravated discharge of a firearm arising from that conviction.

## STANDARD OF REVIEW

A petition for a writ of habeas corpus for a petitioner in state custody is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996). To be entitled to habeas relief a petitioner must show that he is in custody in violation of the Constitution or laws or treaties of the United States and, more specifically, that his or her incarceration results from a state court decision that is "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(a),(d). Although state courts' factual determinations are presumed correct in this context, a petitioner can overcome this presumption by a showing of

"clear and convincing" evidence that the factual determination was erroneous. 28 U.S.C. § 2254(e)(1).

A federal habeas petition usually cannot be heard unless a petitioner has first litigated his claims in state court to completion. 28 U.S.C. § 2254(b). Avoiding a procedural default requires the petitioner to "'fairly present' a claim to each level of the state courts." *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013). An Illinois petitioner filing after post-conviction proceedings must have presented the claim to both the Illinois Appellate Court and the Illinois Supreme Court. *Id.* In presenting the claim, "both the operative facts and controlling law must be put before the state courts." *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006). This requirement exists to give state courts the first right of refusal for claims originating in their jurisdictions. *Id.*

Fair presentment requires substantial similarity of fact and legal substance rather than "hypertechnical congruence" between claims of different court tiers. *Id.* at 814-15. Cal has presented and briefed his federal claims at all levels of the state courts, and thus his federal claims are not procedurally defaulted.

## ARGUMENT

Because the Illinois courts have denied Cedric Cal's attempts to seek relief on the claims presented in his Petition, a writ of habeas corpus is his sole remaining opportunity to vindicate his constitutional rights. Cal puts forward two claims for relief. First, Cal's continued incarceration constitutes both a due process violation and an Eighth Amendment violation where he has put forth a "truly persuasive" demonstration of actual innocence. Second, Cal's continued incarceration constitutes a due process violation because his conviction rests solely on irredeemably unreliable evidence – namely, the testimony of an individual who, all parties agree, has at some point lied under oath.

13

I.     **Cedric Cal's Conviction and Continued Imprisonment Violate the Due Process Clauses of the 5th and 14th Amendments as well as the 8th Amendment Because he is Actually Innocent**

"Habeas corpus…provide[s] the added assurance for a free society that no innocent man suffers an unconstitutional loss of liberty." *Schneckloth v. Bustamonte*, 412 U.S. 218, 256 (1973) (Powell, J., concurring). Indeed, "the central reason for habeas corpus [is] the affording of means…of redressing an unjust incarceration." *Id*. at 257–58. For this reason, the Supreme Court has recognized the potential cognizability of a "free standing" habeas innocence claim under sufficiently compelling circumstances. *Herrera v. Collins*, 506 U.S. 390, 417 (1993) ("We may assume . . . that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim"); *see also Id*. at 429 (Scalia, J., dissenting) ("today's decision… assumes permanently… that a constitutional right exists" supporting a free standing habeas innocence claim).[2] Relatedly, the Supreme Court has long recognized a "fundamental miscarriage of justice" exception to procedural imperfections in the habeas context when sufficient evidence indicates that the petitioner is indeed innocent. *See, e.g., Schlup v. Delo*, 513 U.S. 298, 313 (1995). This exception recognizes, in turn, that to render innocence irrelevant in the context of habeas is to fundamentally undermine the purpose and history of the writ – as well as the constitutional principles it is designed to protect. *See, e.g., Murray v. Carrier*, 477 U.S. 478, 495 (1986) (principles of comity and finality must yield to the

---

[2] Although much of the discussion in *Herrera* specifically addressed a free-standing innocence claim in the capital context, the Court also expressly noted in *Herrera* its longstanding "refus[al] to [apply a] different standard of review on federal habeas corpus" to death penalty and non-death penalty cases. *Herrera*, 506 U.S. at 405, quoting *Murray v. Giarratano,* 492 U.S. 1, 9 (1989) (plurality opinion).

overriding habeas "imperative of correcting a fundamentally unjust incarceration"),

quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982).

The Eighth Amendment bar against cruel and unusual punishment also prohibits the

incarceration of an innocent person. Punishment is unconstitutional under the Eighth

Amendment if it "(1) makes no measurable contribution to acceptable goals of punishment and

hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2)

is grossly out of proportion to the severity of the crime." *See Coker v. Georgia*, 433 U.S. 584,

592 (1977). The incarceration of an innocent does nothing to further acceptable goals of

punishment and is grossly out of proportion to the severity of the crime committed because the

innocent *has committed no crime*. Indeed, the Court has written that "[e]ven one day in prison

would be a cruel and unusual punishment for the 'crime' of having a common cold." *Robinson v.

California*, 370 U.S. 660 (1962). It is unacceptable to punish someone who has committed no

crime.

It follows that the incarceration of a demonstrably innocent person is "shocking to the

conscience," *Rochin v. California,* 342 U.S. 165, 172 (1952), "contrary to contemporary

standards of decency," *Ford v. Wainwright,* 477 U.S. 399, 406 (1986), and offensive to a

"principle of justice so rooted in the traditions and conscience of our people as to be ranked as

fundamental," *Medina v. California,* 505 U.S. 437, 445-446 (1992). In other words, incarceration

of an innocent person violates both substantive due process and the Eighth Amendment's

prohibition against cruel and unusual punishment. U.S. Const. amends. V, VIII, XIV.  Thus,

when actual innocence has been credibly established – even absent an additional constitutional

violation – a habeas court ought to exercise its inherent "equitable discretion," *McQuiggin v.

Perkins*, 569 U.S. 383, 392 (2013), to prevent, above all, a fundamental miscarriage of justice by

15

recognizing such claims. *See Herrera,* 506 U.S. at 404 ("fundamental miscarriage of justice exception, is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons") (internal citation omitted).

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner may obtain habeas relief if the state court adjudication of the constitutional violation at issue "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). State court factual findings are entitled to great deference in this context; however, "deference does not imply abandonment or abdication of judicial review [and] [d]oes not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Rather, a state court's factual determination is presumptively reasonable, but a petitioner may rebut this presumption with clear and convincing evidence. *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008); *Harding v. Walls*, 300 F.3d 824, 828 (7th Cir. 2002) ("relief may be had where the petitioner can show by clear and convincing evidence that the state court's factual determinations were unreasonable"). In addition, no deference is required if the state court's factual finding is "objectively unreasonable." *Miller-El, 537 U.S.* at 340-41. The Seventh Circuit has characterized this standard as "daunting . . . but not insurmountable." *Ben-Yisrayl*, 540 F.3d at 549.

Cedric Cal's case is one that meets the high standard applicable to actual innocence claims raised in habeas proceedings, because the evidence of his actual innocence of the crime was "truly persuasive" and the Illinois courts' refusal to credit this evidence was, accordingly, an unreasonable determination of the facts. Johnson testified, under oath at a post-conviction evidentiary hearing, that he had lied at trial. Johnson's testimony was the only evidence that

linked Cal to the shootings in this case. Moreover, Johnson provided a compelling explanation for why he lied at trial and why he felt safe coming forward with his recantation when he did. Thus, this case presents a situation in which the state courts, despite clear and convincing evidence that Cal was not one of the men who shot Willie Johnson, Cedric Herron, and Sammy Walker, refused to grant him a new trial. Such a decision was objectively unreasonable. Johnson's recantation not only exonerates Cal – it completely eliminates the case the State built against him at trial. In addition, for a host of reasons, it was objectively unreasonable for the state courts to dismiss it out of hand. Johnson's version of events at the evidentiary hearing was, to begin, more plausible  his version of events at trial. Johnson's bias – as an "enemy" of the defendants, a close friend of the deceased victims and someone who was himself seriously injured in the crime – establishes that Johnson had every reason to see the true perpetrators punished and no reason to falsely aid Cal and Kirkman. Finally, since recanting his trial testimony, Johnson has remained unshaken, despite the fact that his recantation lead to his prosecution and ultimate incarceration, consistently maintaining nonetheless that Cal and Kirkman were not the men who shot him. In light of such evidence, Cal's conviction and continued incarceration violate due process and the Eighth Amendment.

### A. Willie Johnson's Recanted Testimony, Along with Other Corroborative Evidence and Testimony, Establishes That Cedric Cal is Actually Innocent of the Crime for Which He Was Convicted

Willie Johnson's recanted testimony confirms what Cedric Cal has consistently maintained for the past 24 years: that Cal was not one of the two men who shot Johnson, Cedric Herron, and Sammy Walker on April 21, 1992. At trial, Cal was convicted based solely on Johnson's eyewitness testimony; without that testimony, there is nothing remaining to link him to the shooting.

17

As the Seventh Circuit has held, "[a] state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable." *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003). Here, the state courts unreasonably determined that Willie Johnson's recantation of his trial testimony was incredible and "not material," despite the fact that it cut to the very heart of the State's case against Cal and Kirkman and that Johnson had a clearly articulated reason for not coming forward sooner. PC R. R9; *People v. Cal*, No. 1-11-2354, 2013 WL 2325841 (Ill. App. Ct. May 28, 2013), at 10. Contrary to the state courts' conclusion, Johnson's recantation is material, plausible, and internally consistent. The recantation addresses the ultimate issue in this case: the identities of the offenders. At trial, Johnson was the only witness tying Cal to the crime. To conclude that his recantation – which fully exonerates Cal – is "not material," as the state courts did in this case, is "objectively unreasonable." *See Ward*, 334 F.3d at 704. Further, Johnson has consistently maintained since 2009 that Cal and Kirkman were not the men who shot him; he has never wavered from his recantation despite the enormous pressure – including a perjury charge – to do so.

Additionally, Johnson has now provided an explanation for the shooting, testifying that it stemmed from a dispute over drug territory, a far more likely explanation for the attack on all three victims – all of whom were involved in the local drug trade – than a vague personal dispute purportedly involving a family member of just one of the victims. PC R. L21-22, L41.[3] Simply

---

[3] It bears noting that, although Latanya Johnson, Willie Johnson's sister, who lived out of state, did not testify at the evidentiary hearing, she stated in an affidavit – which was attached to the post-conviction petition filed in this matter – that she "did not know who Keith Ford is" and contrary to Johnson's testimony at trial, "did not come home crying [on the date of the shooting] because of Keith Ford"; rather, she was crying because she had had an argument with the father

put, the version of events that Johnson set out in his recantation is significantly more plausible than his initial story at trial. At the evidentiary hearing where he recanted his trial testimony, Johnson explained that the shooting resulted from a dispute between Keith Ford and Herron about Herron's associate selling drugs. PC R. L41. This explains why Ford would return to the area near Johnson's house to eliminate the threat of competition. Indeed, Ford had explicitly threatened Johnson for associating with Herron and Walker. Tr. R. E18, 35. As further demonstration of the truth of Johnson's recantation, Latrese Buford's testimony at trial and in the post-conviction proceedings corroborated Johnson's recantation testimony. Tr. R. E18, E35; PC R. P42–43. In fact, no other evidence has ever contradicted the recantation, just as no physical evidence links Cedric Cal to the crime.

Furthermore, Johnson had a clear motive for perjuring himself at trial, and a clear motive for coming forward with the truth when he did. At the time of the trial, Johnson had an intense fear of Ford, one of the shooters he named in his recantation. It is apparent from the trial record that Johnson was reluctant to appear in court; he failed to show up at court on at least one previous date set for trial, and a warrant was issued for his arrest before he finally appeared to give his testimony. C. 4; Tr. R. C3. The record also shows that, after the shooting, Johnson, his girlfriend, and his family members began receiving phone calls, which Johnson believed to be threats from Ford. PC R. L65-66, P43-44. Johnson received phone calls in his hospital room, while his family received calls at the soul food restaurant where they worked. PC R. L65, P43. Additionally, Johnson's mother believed she was being followed, and people began appearing at the restaurant to ask about Johnson's whereabouts. PC R. L33, P44. Johnson's girlfriend at the

---

of her children on that date. Verified Petition for Post-Conviction Relief Based on Actual Innocence at Exhibit B, para. 26-29.

time, Latrese Buford, testified that Johnson was so frightened that he told her to tell anyone who

asked about him that he was dead. PC R. P42-43. Johnson had a legitimate fear that if he testified

in Cal's trial that Ford was one of the shooters, Ford or his associates would harm Johnson and

his family, especially in light of the threats made to Johnson by Ford just prior to the shooting.

PC R. L62.

On the other hand, Johnson was not afraid of Cal or Kirkman, who did not have Ford's

power and status in the neighborhood where he lived. PC R. 67. At the time of the shooting, Cal

and Kirkman were only seventeen years old and were low-level drug dealers. PC R. L23, L66-

67. Although Latrese Buford was prohibited from testifying to this point at the evidentiary

hearing, defense counsel submitted an offer of proof to the court confirming that Buford would

have testified that Cal and Kirkman were "'nobody' of significance" in the neighborhood –

"netrons" unaffiliated with the gangs warring over drug turf – at the time of the shooting. PC R.

C70-71. Moreover, Johnson testified that he considered Cal and Kirkman enemies, as they

worked for a rival drug dealer. PCR R. L21-22, L41

When Johnson came forward with his recantation, he was no longer afraid because he

had moved far away from Chicago, living in Louisiana and then Texas, and his mother had

passed away. PC R. L18-19, L63, L78. Johnson had also matured significantly since he had

originally testified. When Johnson recanted his trial testimony eighteen years later, he was 40

years old—a middle-aged adult living far from the city where he had been shot in his youth.

Affidavit of Willie Johnson in Support of Motion to Dismiss for Vindictive Prosecution, Case

No. 11 CR 13172 (2013). Additionally, he had received assurances from Ray Longstreet, a gang

leader in Johnson's neighborhood, that he "had nothing to worry about" and that he should

"[j]ust get up there and do the right thing." PC R. L77. Johnson testified that he understood this

to mean that he should "do the right thing and tell the truth, tell the honest to God truth." PC R. L77-78.

Based on a distorted recollection of Johnson's testimony about speaking with Longstreet, the post-conviction court determined that Johnson's recantation was motivated solely by his gang allegiance and should, therefore, be disregarded. The appellate court repeated this error. *People v. Cal*, No. 1-11-2354, 2013 WL 2325841 (Ill. App. Ct. May 28, 2013), at 13 ("[W]e do not find that the circuit court erred in concluding that Johnson's reason for recanting appeared to be out of his gang allegiance"). This was yet another unreasonable determination of the facts given that the record contained no evidence that Johnson was under any pressure to lie at the post-conviction hearing or subjected to any undue influence. Rather than evaluating the credibility of Johnson's recantation based on evidence in the record, the circuit court merely "inferred that Johnson was acting in the interest of the Vice Lords," and the Illinois Appellate Court did the same. *People v. Cal*, 2013 WL 2325841 at 13. The record, however, did not support this conclusion. In fact, the only record evidence regarding the Johnson/Longstreet call established that Longstreet urged Johnson only to tell the truth. Johnson testified that he spoke with Longstreet very briefly; the conversation lasted less one minute. PC R. L78. Furthermore, Johnson testified that he was no longer involved in the Vice Lord gang and therefore had no duty to obey any request from Longstreet had he made one. *People v. Cal*, No. 1-11-1354, 2013 IL App (1st) 112354-U (2013), at 13. Johnson also specifically testified to the fact that he was not pressured or threatened to recant his trial testimony. PC R. L79–80. The post-conviction court's failure to credit Johnson's recantation testimony based on a theory that had no evidentiary basis – that Johnson testified out of gang loyalty – ignored uncontested record evidence that he was merely told to "do the right thing," which he understood to mean that he should tell the truth. PC

R. L77-78. Because there is no evidence in the record to support the state courts' conclusion that Johnson's testimony was incredible due to his former gang affiliation, this is an objectively unreasonable factual finding that cannot stand.

It is worth noting that the unreasonable nature of the post-conviction court's factual findings is further exemplified by the fact that the court completely misapprehended Johnson's testimony that there were *two* shooters in this case. In deciding not to credit Johnson's recantation, the lower court found that Johnson testified that there was only "one shooter and one gun" and that in light of the fact that Johnson, Herron, and Walker all sustained multiple gunshot wounds and there were 13 shell casings found at the scene, Johnson's testimony was implausible. PC R. R4. This finding was an untenable interpretation of the facts. Johnson had testified that "two" people arrived on the scene "with guns" and that they were coming at him, Walker, and Johnson in an "aiming position." PCR R. L26-27. He repeatedly stated throughout his testimony that two individuals were shooting at them. PCR R. L29, 30, 48, 55. He recognized one of the shooters as Keith Ford, but did not know the other individual by name, although he recognized him as well. PCR. L28-29. Thus, the court's reliance on its unsupported conclusion that a single shooter committed this offense, is further indication of its unreasonable assessment of the facts.

Moreover, there is also a complete *lack* of evidence of guilt in this case. The Seventh Circuit's decision in *Tabb v. Christianson* is instructive. 855 F. 3d 757 (7th Cir. 2017). In *Tabb*, the defendant sought habeas relief, arguing that the lineup in which the victim identified him was suggestive. *Id.* at 759. The Seventh Circuit recognized that it was "possible" that the defendant could have been innocent because the case against him "depended entirely on the accuracy of [the victim's] identification." *Id.* at 764. Yet, the court concluded, the defendant's evidence was "not strong enough" to "break . . . new constitutional ground" because he had not provided

"objective and highly reliable evidence of actual innocence." *Id.* This was becuase the victim who identified the defendant maintained that his identification, notwithstanding the lineup, was accurate. *Id.* at 761-62.

This case presents a different situation – without Johnson's trial testimony, no evidence remains linking Cal to the crime. This is not a case in which eyewitness testimony formed *part* of the State's case against a criminal defendant; the State's *entire* case was founded upon Johnson's testimony. No physical evidence, confession, or other eyewitness connects Cal to this crime. However, despite the fact that the sole eyewitness to the crime recanted that testimony in a formal evidentiary hearing, the Illinois courts denied Cal a new trial. Both this ultimate decision, and the factual determinations underlying it, were objectively unreasonable and counter to the credible, material evidence presented at the evidentiary hearing that demonstrated Cal's actual innocence of this crime.

**B.    Because Willie Johnson's Recantation Contains Indicia of Reliability, it Should not be Subject to the Skepticism Normally Applied to Recantations. Moreover, Given the Emerging Understanding of Wrongful Convictions, the General Skepticism with which Courts View Recantation Testimony is Unwarranted**

While courts generally take a skeptical view of recantation testimony*, see, e.g., U.S. v. Griffin*, 84 F.3d 912, 929 (7th Cir. 1996), the state courts' refusal to credit Johnson's evidentiary hearing testimony was nonetheless unreasonable, given that Johnson was a *victim* of the shooting and testified against his own interest. Johnson was severely injured by the perpetrators of the offense; he was shot nine times and was hospitalized for injuries to his wrist, arm, legs, and testicles. Tr. R. D52-53, PC R. L24. Johnson also watched his cousin and friend, Herron and Walker, being shot and killed. He testified at the evidentiary hearing that he saw Herron "drown[] in his own blood" and that Walker who had been "pulled into" Johnson's mother's

23

apartment, "bled out" there. PC R. L30-31. Despite the trauma of the shootings, and despite the fact that Johnson "[did not] want to be [ ] in Chicago, period," Johnson came forward to recant his trial testimony once he felt safe from Keith Ford. PC R. L79. He also stood by his recantation despite a perjury prosecution that forced him to return to Illinois, far away from his life in Texas, and ultimately lead to his incarceration.[4]

Indeed, Johnson would have been better off not testifying at the 2011 evidentiary hearing. Just months after his testimony, the Cook County State's Attorney charged him with perjury under the theory of "contradictory statements . . . in the same or in different proceedings." *People v. Johnson*, 11-CR-13172; 720 ILCS 5/32-2(b) (West 2010). Yet, in the years since he testified at the post-conviction evidentiary hearing and recanted his trial testimony, Johnson has never wavered from that recantation – even when it would have been in his interest to do so. When Johnson was prosecuted for perjury, he did not revert to his trial testimony or agree that he had lied at the evidentiary hearing; rather, he accepted the only plea that he could: that he had made contradictory statements under oath in two different proceedings.

Thus, Johnson's recantation is highly reliable – it was made against his own interest, and he provided a compelling explanation for his initial false trial testimony. As Johnson put it, facing threats and retaliation directed towards himself and his loved ones, and fearful of Keith Ford, he identified two individuals who he did not like and did not fear. His testimony was corroborated by the trial testimony of John Sylvester and Latrese Buford, as well as by Buford's post-conviction testimony. Meanwhile, Ford had no credible alibi for his whereabouts at the time

---

[4] Johnson was originally sentenced to 30 months in prison for the perjury charge. This sentence was later commuted via a grant of executive clemency. *See Pardons Play Key Role in Granting Justice*, CHICAGO SUN TIMES, June 24, 2016, *available at* https://chicago.suntimes.com/opinion/pardons-play-key-role-in-granting-justice/

of the shooting. Johnson came forward after he had moved out of state and no longer had any reason to fear Ford.

It follows that, in contrast to the general presumptions against recantation evidence, Johnson's recantation should be viewed as particularly reliable, given the fact that it contains certain indicia of reliability – namely, that it was against his own interest to come forward with that testimony. It is worth noting that, in other contexts, Illinois courts accept the enhanced reliability of statements made against a declarant's interest; Illinois Rule of Evidence 804(b)(3) recognizes statements made against one's own interest to be an exception to the rule against hearsay. Ill. R. Evid. 804(b)(3). This rule is substantially similar to Federal Rule of Evidence 804(b)(3), which is based on the assumption that "persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." Fed. R. Evid. 804 (advisory committee's note to subdivision (b)). Thus, despite the skepticism with which courts have historically viewed recantation evidence, "jurists now recognize that such statements can, and often do, bear indicia of reliability which may justify their occasional admission." Adam Heder and Michael Goldsmith, *Recantations Reconsidered: A New Framework for Righting Wrongful Convictions*, 2012 UTAH L. REV. 99, 109 (2012). Therefore, although recantations are often viewed as unreliable, where there are other indicia of reliability – such as where the statement is made against the recanting witness's interest and, as is the case here, the statement has been corroborated by other evidence or witnesses – the presumption against recantations should not carry weight. *Id*. at 128-36.

Additionally, the Seventh Circuit's hesitance to accept recantation evidence is rooted – at least in part – in the fact that isuch evidence often comes outside the formality of court proceedings. *See, e.g., Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) (describing

disbelief of recantations as "sensible" in part because "the formality of a court, the presence of the litigants, and the gaze of a judge induce witnesses to hew more closely to the truth than they do when speaking in private"); *Scott v. Montgomery*, No. 10 C 4954, 2012 WL 404241, at *11 (N.D. Ill. Feb. 6, 2012) ("The Seventh Circuit has held that recantations of testimony . . . should be viewed skeptically because such recantations come outside of the formality of court proceedings, which encourage truthfulness.").[5] This case, however, does not concern what Willie Johnson may have said during a private conversation or in an affidavit or declaration not subject to cross examination. Rather, it concerns Johnson recanting his testimony in a post-conviction evidentiary hearing. The fact that an evidentiary hearing was held, where the witness testified under oath and was subject to cross examination as well as examination by the court, should alleviate any issues raised by the lack of formality that may be associated with some recantations. Moreover, to the extent that the skepticism around recantations also stems from the goals of "protect[ing] witnesses after trial" such that they are not "hounded" by the defendant (or his friends, family, or advocates) after trial, those concerns are surely minimized in a case – such as this – where the recantation occurred almost twenty years after the original testimony and where there is no evidence that Johnson had been pursued or pressured in the intervening decades.

---

[5] It should be noted that, in the context of Rule 33 motions for a new trial, the Seventh Circuit has articulated a specialized test for determining whether recantation evidence requires the granting of a new trial, which includes three prongs: 1) whether the recantation evidence is true; 2) whether the jury might have reached a different result had the witness testified truthfully; and 3) whether the false testimony took the defendant by surprise. *U.S. v. Leibovitz*, 919 F.2d 482, 485 (7th Cir. 1990) (holding that the third prong of the test is dictum and should not be required in every case). While that test is not specifically applicable here, as discussed in detail in this memorandum, there was ample evidence presented at the post-conviction proceedings in this matter that Johnson's recantation testimony was true and that, given that his identification was the sole evidence against Cal and Kirkman at trial, a jury likely would have reached a different result if it heard that testimony.

Even without any additional indicia of reliability, however, courts' historical skepticism against recantations is unwarranted. A 2013 study by researchers at the National Registry of Exonerations showed that truthful recantations are more common than previously believed. Researchers examined 1,068 cases in which individuals convicted of crimes were ultimately exonerated; 23% of those cases involved post-conviction recantations by witnesses. Samuel R. Gross, *Witness Recantation Study: Preliminary Findings*, The National Registry of Exonerations (2013), at 2. Over half of those post-conviction recantations were murder cases, and most of the recantations were from supposed eyewitnesses to the crime. *Id.* at 4-6. The National Registry of Exonerations also maintains a database of exonerations broken down by the factors that contributed to the wrongful conviction. *% Exonerations by Contributing Factor,* The National Registry of Exonerations (2018), https://www.law.umich.edu/special/exoneration/pages/exonerationscontribfactorsbycrime.aspx  As of April 2018, there are 2,204 cases in this database. Of those 2,204 cases, 1,257 (57%) involved perjury or a false accusation. *Id.* This number is even higher for homicide cases: of 902 cases examined, 622 (69%) involved perjury or a false accusation. *Id.* Thus, complete skepticism about the reliability of recantations is misplaced; in fact, in numerous cases, the truth of recantations has been borne out by incontrovertible exonerating evidence like DNA testing. *See*, *e.g.*, *People v. Dotson*, 163 Ill. App. 3d 419 (1st Dist. 1987) (affirming denial of motion for post-judgment relief where single eyewitness recanted her testimony identifying defendant as her assailant); Marcella Kreiter, *Illinois Pardons First Man Cleared by DNA*, UPI, January 10, 2003, available at https://www.upi.com/Ill-gov-pardons-first-man-cleared-by-DNA/55321042227910/ (noting that Dotson was pardoned in 2003 by Gov. George Ryan after being exonerated by DNA evidence in 1989).

In sum, Johnson's recantation testimony, which was material, significant, and compelling, bore all of the hallmarks of the type of evidence that courts should credit and was powerful evidence of Cal's innocence. The post-conviction court's rejection of that testimony and its conclusion that it was incredible and immaterial is not supported by the record. In light of the evidence presented, the state court's decision was objectively unreasonable, and habeas relief is required to vindicate Cal's constitutional rights.

**II.     Cedric Cal's Conviction Violates the Due Process Clauses of the 5th and 14th Amendments in that His Conviction Rests Entirely on Unreliable, Perjured Evidence that is Insufficient to Support his Conviction**

While Mr. Cal maintains that no reasonable fact-finder could credit Mr. Johnson's original testimony over his extensive and corroborated recantation, a due process violation exists in either event as it is uncontested that Mr. Cal's conviction rests now solely on the testimony of a witness whose reliability has been called into serious doubt. That is, if this Court finds that Johnson's testimony at the evidentiary hearing was not sufficient to establish Cal's actual innocence, or if the Court chooses not to recognize a free-standing claim of actual innocence, this Court should grant federal habeas relief as Cal's conviction is now based solely on unreliable evidence, which is a violation of Cal's 5th and 14th Amendment Due Process Rights. U.S. Const. amends. V, XIV. Regardless of which version of Johnson's testimony is credited, there is no question that he lied under oath at some point in this matter and that he has been convicted of perjury. Continuing to incarcerate Cal based on this evidence and this evidence alone violates due process.

As noted in Argument I, the Due Process Clause guarantees that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The United States Supreme Court has found that "concern about the injustice that results from

the conviction of an innocent person has long been at the core of our criminal justice system." *Schlup*, 513 U.S. at 325 (citations omitted). The Supreme Court has further held that the Due Process Clause does not permit convictions based on unreliable or insufficient evidence. *Jackson v. Virginia*, 443, U.S. 307, 316 (1979) ("no person shall be made to suffer the onus of a criminal conviction except under sufficient proof"); *In re Winship*, 397 U.S. 358 (1970); *see also Sheffield v. U.S.*, 397 A.2d 963, 966-67 (D.C. Cir. 1979) (citing *Manson v. Braithwaite*, 432 U.S. 98 (1977) and noting the use of an unreliable identification process violates due process).

Further, courts have found that when the prosecution fails to correct materially false testimony by a government witness, even inadvertently, this, too, violates due process. *Ross v. Heyne*, 638 F.2d 979, 986 (7th Cir. 1980); *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003) ("when false testimony is provided by a government witness without the prosecution's knowledge, due process is violated only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted" (citations omitted)).

The state courts' determination that Cal's conviction should stand is based on the unreasonable determination that Johnson's trial testimony should be credited and remains reliable despite all that has followed and all that has been revealed. However, under any theory regarding Johnson's version of the events – that he lied at trial or that he lied in his recantation testimony – there is no question that Johnson has, at some point, given false testimony under oath. Johnson stated at trial that Cal and Kirkman were the individuals who committed the shooting in this case and retracted that testimony at the evidentiary hearing, instead identifying a new perpetrator. The post-conviction court failed to grant the post-conviction petition because it unreasonably credited Johnson's trial testimony. Under any theory of the case, Johnson has now

29

demonstrated through his conflicting testimonies that, standing alone, his testimony is insufficiently reliable to support a conviction, and the state courts should have recognized that this essentially nullified the conviction in this matter. The Cook County State's Attorney's Office, in fact, agreed that Johnson has, inescapably, lied at some point while under oath, prosecuting him for perjury under the theory that he made contradictory statements under oath regarding his identification of Cal. Frank Main, *Murder Witness Recants, is Charged with Perjury*, CHI. SUN TIMES, September 3, 2011, 2011 WLNR 17458797; Case No. 11-CR-13172; 720 ILCS 5/32-2(b). Further, the reviewing court acted unreasonably in affirming that decision where Johnson's testimony was the sole evidence upholding Cal's conviction – and especially in light of the perjury charge he was facing at the time of the appellate proceedings in this matter and of which the court was aware. Given the lack of any other evidence against Cal at a retrial, it is unlikely that the jury would have convicted Cal solely based Johnson's original testimony in light of both his recantation and his perjury conviction. *People v. Cal*, No. 1-11-2354, 2013 WL 2325841 (Ill. App. Ct. May 28, 2013), at 13.

In *Smith v. Cain*, the United States Supreme Court reversed a conviction that was based on a single eyewitness who was discovered to have undisclosed, conflicting statements that resulted in a *Brady* violation. 565 U.S. 73 (2012). As with this case, there was no other evidence linking the defendant to the crime. *Id.* at 76. The Court stated:

> We have observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. That is not the case here. Boatner's testimony was the *only* evidence linking Smith to the crime. And Boatner's undisclosed statements directly contradict his testimony . . .

*Id.* (emphasis in original).

Although this is not a *Brady* case, *Smith* is instructive because Johnson's testimony was the *only* evidence linking Cal to the crime, and he has now made conflicting statements. As in

*Smith*, the only evidence linking Cal to the crime has been proven to be demonstrably unreliable; there is no other evidence to sustain confidence in Cal's guilty verdict. Johnson's contradictory testimony requires that Cal be granted a new trial in order to determine if there is any evidence remaining to uphold Cal's conviction. The State agreed both in argument at Cal's evidentiary hearing – and, ultimately, in seeking (and obtaining) Johnson's conviction for perjury – that Johnson has lied, at some point, under oath in this matter. Given both Johnson's recantation and his conviction for perjury relating to this very case, it was unreasonable of the state courts to uphold Cal's conviction as it is based on nothing but Johnson's words. Johnson's status as a perjurer has clearly and convincingly weakened the foundation for Cal's conviction and both the post-conviction and reviewing courts unreasonably allowed this singular piece of unreliable evidence to uphold Cal's conviction. Due process demands that Cal's conviction be overturned.

## CONCLUSION

Cedric Cal has spent more than two decades in prison for a crime he did not commit – a crime of which he was convicted based solely on eyewitness testimony that has now been completely recanted. For the foregoing reasons, and those described in Petitioner's Petition for Writ of Habeas Corpus, Petitioner Cedric Cal respectfully requests that this court grant his petition, vacate his conviction, and order the state court to retry him within 60 days or release him. In the alternative, Petitioner requests an evidentiary hearing before this court so that any additional factual record may be developed in order to determine *de novo* whether Petitioner's constitutional claims have merit.

Respectfully submitted,

 /s/ Shobha L. Mahadev
Counsel for Cedric Cal

Shobha L. Mahadev
Alison R. Flaum
Scott F. Main
**Children and Family Justice Center**
Bluhm Legal Clinic
Northwestern Pritzker School of Law
375 E. Chicago Ave
Chicago, Illinois  60611
P: (312) 503-8576
F: (312) 503-8977
E: s-mahadev@law.northwestern.edu