# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **United States of America ex rel.** | ) | |
| **CEDRIC CAL (B-54397),** | ) | |
| | ) | |
| Petitioner, | ) | Case No. 14 C 3834 |
| | ) | |
| vs. | ) | |
| | ) | Case No. of State Court Conviction |
| | ) | 92 CR 10385 |
| **WARDEN STEPHANIE DORETHY,** | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| Respondent. | ) | |

## PETITIONER'S REPLY TO ATTORNEY GENERAL'S ANSWER TO WRIT OF HABEAS CORPUS

In his Petition for Habeas Corpus and Memorandum, Petitioner argued: 1) his conviction and incarceration violated the 5th, 14th, and 8th Amendments of the U.S. Constitution where he was actually innocent; and 2) his conviction and incarceration violated the 5th and 14th Amendments of the U.S. Constitution where his conviction was based on unreliable, perjured testimony insufficient to support his conviction. In its Answer, Respondent Attorney General concedes agreement with Petitioner on two critical points. First, Respondent agrees that Cedric Cal's conviction is based solely on the testimony of a single eyewitness, Willie Johnson, who has since recanted. Second, Respondent agrees that Johnson has held firm to that recantation despite his prosecution by the Cook County State's Attorney's Office – the same entity fighting to defeat the innocence claim predicated on Johnson's recantation and, ultimately, his conviction and imprisonment – for providing conflicting testimony: *i.e.,* his identification of Cal and Kirkman at trial and his recantation of that testimony at the evidentiary hearing in this matter. Together, these facts substantiate Petitioner's claim of innocence and demonstrate that his conviction and incarceration are unconstitutional. They also distinguish this case from the vast majority of post-

1

conviction recantation cases where the recantation undercuts only part of the evidence used to convict or lacks special indicia of reliability. Therefore, pursuant to Habeas Rule 5 and this Court's May 9, 2018 Order, Petitioner submits this Reply in response to the Attorney General's Answer to his Petition for Habeas Corpus and asks that his Petition be granted.

I.    This Case Presents an Extraordinary Situation Where the Surviving Victim of the Underlying Case Provided the Sole Evidence that Convicted the Petitioner and Held Firm to that Recantation in the Face of Prosecution, Conviction, and Imprisonment Based on the Recantation.

With respect to the single-eyewitness testimony in this case, which was provided by the surviving victim, Respondent points to no other evidence – physical or otherwise – implicating Mr. Cal in the shooting that was the subject of his conviction and incarceration almost thirty years ago. *See generally*, Answer 1-15. Rather, Respondent's entire argument is premised on its contention that – although under *Herrera v. Collins*, 506 U.S. 390 (1993) the U.S. Supreme Court recognized the potential cognizability of a free-standing habeas innocence claim – Johnson's recantation does not meet the *Herrera* standard because the state post-conviction court reasonably determined that the recantation was not credible. Answer at 7-15. As discussed further in this Reply, however, the post-conviction court's credibility determinations are not worthy of deference in this case where such determinations were unreasonable and contrary to the clear and convincing weight of the evidence.

Moreover, that Johnson has held firm to his recantation despite his prosecution, conviction, and incarceration for perjury (based on providing contradictory statements under oath, identifying and then rescinding his identification of Mr. Cal and his co-defendant, Albert Kirkman), is significant and further strongly supports the credibility of the recantation. Answer at 14. Indeed, in light of his prosecution and eventual incarceration, Johnson's recantation should be viewed as a statement against penal interest – accompanied by the measure of reliability that

2

is afforded to such statements. *See* FRE 804(b)(3) ("The circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true."); *United States v. Klemis*, 859 F.3d 436, 444 (7th Cir. 2017) ("A statement against interest includes 'one that tends to expose the declarant to criminal liability,'" *quoting* 804(b)(3)). While Respondent contends that because Johnson's crime was "complete" after he testified at the evidentiary hearing in this matter, "he would have gained nothing" from disavowing that testimony, this argument is specious and belies the reality of state court litigation and plea negotiations – in Johnson's specific case and as a general matter. Answer at 14-15. Johnson was indicted on August 18, 2011, and was ultimately sentenced to 30 months in prison pursuant a guilty plea entered on October 7, 2014. *People v. Johnson*, 11 CR 13172-01. Crucially, the factual basis for the plea established only that Mr. Johnson made contradictory statements under oath; there was no finding or proffer regarding which statement was in fact the truth. *Johnson*, 11 CR 13172-01; *see also*, 720 ILCS 5/32-2(b) (West 2011) ("An indictment or information for perjury alleging that the offender, under oath, has knowingly made contradictory statements, material to the issue or point in question, in the same or in different proceedings. . . **need not specify which statement is false**. At the trial, the prosecution **need not establish which statement is false**.") (emphasis added). In addition, as a Class 3 felony under Illinois law, perjury is probationable. 720 ILCS 5/32-2(e); 730 ILCS 5/5-4.5-40. Nonetheless, Mr. Johnson's plea offer provided for 30 months in prison. *Johnson*, 11 CR 13172-01.

Particularly in light of the fact that state court innocence litigation was still pending in the Cal/Kirkman case at the time, it is not hard to imagine that the Cook County State's Attorney's Office may well have offered to drop the charges against Mr. Johnson or offered a plea that did

not require him to spend time in prison if he had agreed to allocute that his recantation was false. While it may at first glance appear far-fetched to suggest that the state's actions in prosecuting Mr. Johnson for perjury were related to its ongoing efforts to oppose the wrongful conviction claims of Mr. Cal and Mr. Kirkman, it should be noted that 23 prominent members of the Illinois bar, including former prosecutors, a former governor, and a former federal judge, took exactly that position publicly in an open letter opposing the prosecution. *See* https://chicago.suntimes.com/news/man-sentenced-to-prison-for-lying-about-1992-double-slaying/; http://www.chicagotribune.com/news/opinion/zorn/ct-anita-alvarez-primary-election-zorn-perspec-0306-20160304-column.html (last accessed 9/14/18). Indeed, Governor Quinn ultimately granted Mr. Johnson clemency in light of concerns regarding the integrity of, and motivations behind, the state's actions. https://chicago.cbslocal.com/2015/01/13/quinn-commutes-sentence-of-man-convicted-of-lying-in-murder-case/ (last accessed 9/14/18). Notably, Mr. Johnson, who had already begun serving his perjury sentence months before, still never wavered from his recantation.

Thus, against the backdrop of Johnson's highly unusual and reliable evidentiary hearing testimony and the pithy nature of the trial evidence against him, the state post-conviction court's dismissal of the recantation does not require that this Court deny relief. As discussed further in this Reply, Respondent's reliance on the state court's evaluation of Johnson's evidentiary hearing testimony is misplaced where the court fundamentally misapprehended that testimony – particularly when juxtaposed against the lack of evidence submitted against Mr. Cal at trial. As such, this Court should grant Mr. Cal's habeas petition.

II.     The State Courts' Factual Determinations Are Not Supported by the Clear and
        Convincing Weight of the Evidence.

In its Response, the Attorney General claims that the state court's rejection of the

recantation in this case was based on three legitimate factors – that the recantation was internally

inconsistent; that the identification being recanted was tantamount to a dying declaration and

therefore inherently reliable; and that the recantation was motivated by nothing other than gang

loyalties. Answer at 5-6. Examination of the actual record reveals that the state court either made

no such findings or made them with "nothing in the record to back…[them] up," *Carlson v. Jess*,

526 F.3d 1018, 1024 (7th Cir. 2008).

Mr. Cal is mindful of the considerable deference accorded state court factual

determinations in the habeas context. But, as both the Seventh Circuit and the U.S. Supreme

Court have noted, such deference "is demanding but not insatiable," *Taylor v. Grounds*, 721 F.3d

809, 817 (7th Cir. 2013); *see also Miller-El v. Dretke,* 545 U.S. 231, 240 (2005), and must be

predicated on a finding that the state courts' reasoning is sound and supported by the record.

Indeed, as the Seventh Circuit has reflected, "[i]n passing section 2254(d)(2), Congress has

reminded…. [habeas courts] that… [they] may no more uphold [an unreasonable] factual

determination than…set aside reasonable state-court fact-finding." *Carlson*, 526 F.3d at 1024

(internal citation omitted).

What habeas review requires, then, is presumptive but not preclusive deference to state

court fact finding and, in turn, a meticulous and searching evaluation of the state courts' factual

conclusions to ensure that they did not "ignore[ ] the clear and convincing weight of the

evidence." *Goudy v. Basinger,* 604 F.3d 394, 399-400 (7th Cir. 2010); *Ward v. Sternes,* 334 F.3d

696 (7th Cir. 2003); *see also Carlson,* 526 F.3d at 1024 (state court's factual finding is

unreasonable for habeas purposes when there is "nothing in the record to back it up"). Relatedly,

a habeas court cannot rely on a state appellate court's endorsement of a state trial court's factual determinations where, as here, the appellate court unreasonably relied on the trial court's findings, "merely paraphrasing" the trial court or being led by the trial court's errors into making its own unreasonable factual findings in a manner that ultimately compounds, rather than dispels, the error at issue. *Carlson*, 526 F.3d at 1024.

Nor can a habeas court avoid close examination of state fact finding merely because such fact finding involved credibility determinations – despite the Respondent's claim to the contrary. Answer at 11 ("2254(e)(1) places the issues of Johnson's credibility beyond debate"). Quite the opposite, a "federal [habeas] court can disagree with a state court's credibility determination and… conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

For all of these reasons, this Court must scrutinize the actual state court record in this matter and not rely on the Respondent's characterization of that record – or the Petitioner's, for that matter – to assess the reasonableness of the state court's factual determinations. Characterizations aside, what the state court decision itself – an oral ruling constituting of a mere six and a half transcript pages – contains are unreasonable and unsupported factual determinations, utterly belied by the record. As detailed below, these factual determinations either ignored the clear and convincing weight of the evidence or, in some cases, ignored the evidence entirely.

A. The State Court Finding Regarding the Recantation's Purported "Internal Inconsistencies" Was Contrary to the Clear and Convincing Weight of the Evidence.

Beginning with the state court's evaluation of the internal reliability of the recantation, examination of the trial court's actual decision reveals that the trial court found the recantation wanting not because it was *internally* inconsistent, as the Attorney General now suggests, but

6

because – quite naturally – it conflicted with the witness' now repudiated testimony at the original trial. Resp. Exh. Z at S4-S5 (comparing witness' post-conviction testimony with his testimony at the 2004 trial). Moreover, the primary "inconsistencies" cited by the state court were not inconsistencies at all but gross misreadings of the record, leading the state court to discredit the witness despite, not because of, the evidence before it. At the same time, the state court failed to consider two key the factors traditionally associated with assessment of recantation reliability – both of which strongly support a finding that the recantation was indeed reliable.

1. The State Court's Findings Regarding the Recantation's Purported Inconsistencies Were Premised on "Statements" the Witness Did Not In Fact Say

The trial court's primary stated reason for its rejection of the recantation witness – and, inevitably, Mr. Cal's entire innocence claim – was the court's finding that the witness had been unforgivably "inconsistent" about a key fact in the case: whether one or two shooters had perpetrated the crime. Specifically, the trial court claimed that the witness testified at the evidentiary hearing that the crime involved a single shooter when all prior testimony, and ballistics evidence, indicated the presence of two shooters. *Id.* at S5. Had the witness in fact testified as the trial court described – radically altering a key fact at the heart of the case – there might indeed have been cause for concern. But the witness did not testify in the post-conviction hearing that he was shot by just one person. Instead, the post-conviction record establishes that the witness consistently described two shooters – nearly 20 times. *See, e.g.*:

> Q: At some point did anyone else arrive at that address?
> A: Yes, ma'am.
> Q: How did – how many other people arrived?
> A: **Two**.
> Q: How did they arrive?
> A: With guns…I turned around and **I seen them they** was just coming to an aiming position at myself and my associates.

7

*Id.* at L26.

Q: And who were **the two** – were **the two individuals that were shooting at you the two people who you described** coming up to the property?
A: **Yes**, ma'am. **They** was coming up to the property.
*Id.* at L27.

Q: How close were **the two men** to you when you were being shot?
A: About two feet. About two feet.
Q: Did you have an opportunity to see the faces of those **two men**?
A: I did.
*Id.* at L28.

Q: Did you recognize **the two men that were shooting at you**?
A: I recognized **both men** but I didn't know one of them. One of them I didn't know but I recognized both of the men, meaning **I seen both of them** but I could point out one to as far as saying I know him…
*Id.* at L28.

Q: The **other man that was shooting at you**, not Mr. Ford, you said you recognized him but you didn't know his name, is that correct?
A: Right.
*Id.* at L29.

Q: Mr. Johnson, what happened after you were shot?
A: I sit back, I watched the **two gentlemen that was shooting** walked away…
*Id.* at L30.

Q: And you had a conversation with the officers and…[t]hey asked you who shot you and you told them it was **Duke and another guy** whose name you didn't know or whose name you didn't say…
A: They came to me with two pictures…
Q: And at that time, then, you agreed those were the **two guys** that shot you?
A: I did.
*Id.* at L49-L50 (emphasis added).

It is against this backdrop – a record establishing that the witness's post-conviction testimony referred to the presence of two shooters *nearly twenty times* – that the trial court nonetheless dispatched the witness by claiming, repeatedly, that the witness "testified that it was one shooter." *Id.* at S5. This finding was not reasonable.

The second "inconsistency" on which the trial court premised its rejection of the recantation was the trial court's claim that the recantation witness, "testified...at this third stage [post-conviction] hearing… that…he did not quite remember talking to the police officers at the hospital…[but] testified at the trial of the defendants…that he told the police at the hospital that the defendants were involved." *Id.* at S4. This is, to begin, not an *internal* inconsistency reasonably belying confidence in the plausibility of the recantation. Even more significantly, however, this is not an accurate description of the witness' post-conviction testimony. The witness did not claim to have no memory of his conversation with the police at the hospital, which would indeed have been suspicious. On the contrary, he testified to it extensively in the post-conviction hearing. Here is what the witness actually said on this point at that hearing:

> Q: Did you speak to anyone at the hospital?
> A: I did.
> Q: Who did you speak with?
> A: My sister and my lady friend and then shortly thereafter a couple of officers had came up to me.
> Q: Those were Chicago police officers?
> A: Yes, ma'am.
> Q: Did you talk to those officers about your being shot?
> A: Well, I can't really quite remember but, I mean there were some things that were being said, you know.
> Q: Did you tell those officers who it was that shot you?
> A: They actually showed me two pictures. They showed me two pictures and, you know, again, I didn't really like these guys, you know. What can I say. It's the street.
> ***
> Q: Let me go back and ask you a few questions about that. At the hospital the police showed you photographs of two men?
> A: They did.
> Q: Who were those men?
> A: The two gentlemen that's sitting in front of you.
> Q: That's Mr. Cal and Mr. Kirkman?
> A: Yes, ma'am.
> Q: Did you tell those police officers then it was Mr. Kirkman and Mr. Cal that had shot you?
> A: I did.
> *Id.* at L32-L33.

To conclude, on the basis of this record, that the witness effectively claimed amnesia at the evidentiary hearing was not reasonable. Like the trial court's conclusion regarding the witness' phantom "one shooter" testimony, it is not merely unsupported by the record, it is flatly contradicted by it.

2. The State Court's Findings Regarding the Recantation's Purported Inconsistencies Entirely Ignored Record Facts Supporting the Reliability of the Recantation

Not only did the trial court reject the recantation on the basis of non-existent inconsistencies, its misplaced emphasis on these purported deficiencies in the recantation also led the court to ignore facts and factors that strongly support a finding that the recantation was worthy of belief – most significantly, perhaps, the fact that the recantation was a statement against penal interest, *see, United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008) (fact that recantation is against penal interest bears on recantation's reliability), and the fact that no evidence of any kind contradicted the recantation or supported the witness's original accusation, *see*, *U.S. ex rel. Burton v. Mote*, No. 01 C 9744, 2003 WL 23019174, at *7 (N.D. Ill. Dec. 23, 2003) (fact that recantation is contradicted by physical evidence – and original testimony was supported by physical evidence – bears on recantation's reliability.)

For the reasons discussed in Section I of this Reply, there is no question that the recantation in this case was against the witness' penal interest. Indeed, it led directly to his prosecution and imprisonment. *See* Frank Main, *Murder Witness Recants, is Charged with Perjury*, CHI. SUN TIMES, September 3, 2011, 2011 WLNR 17458797. In addition, it is significant that no evidence of any kind contradicts the recantation – just as no other evidence ever supported the witness' original identification. The fact that the witness' word was sufficient to convict Mr. Cal – in the absence of any physical evidence, confession or corroborating witnesses – ought not to have been irrelevant to the question of whether that same witness's

10

word, now given at great personal expense, was to sufficient to warrant a new trial. It was unreasonable for these factors to play no role whatsoever in the state court's evaluation of the recantation's reliability.

   B.  The State Court Finding that the Original Identification in this Case was Effectively a Dying Declaration was Contrary to the Clear and Convincing Weight of the Evidence.

        Although the trial court's primary reason for rejecting the recantation at issue here were the "inconsistencies" detailed above, the trial court did also make reference to notion that the recanting witness' original identification of Mr. Cal and Mr. Kirkman – when he was interviewed by detectives some hours after the shooting in this matter – was a "dying declaration" and therefore, particularly worthy of belief. As with the alleged recantation inconsistencies, however, the record, by clear and convincing evidence, does not support this finding. On the contrary, the record indicates that the witness expressly denied that he believed himself to be dying at the time of his original identification and instead explained that his motivation for falsely naming Mr. Cal and Mr. Kirkman at that time was fear of retaliation by the real perpetrator:[1]

> Q: Did you tell those police officers then it was Mr. Kirkman and Mr. Cal that had shot you?
> A: I did.
> Q: Why did you do that?
> A: Well, for one, I just got shot up and my guys had just got killed and **I didn't know if I was going to die or not** and on top of that my mother had already started receiving silent calls and guys was following my mother around and my sister was being threatened, you know, and there wasn't much I could do for my sister and everything like that, so **for the most part the things I said I said out of fear** you know, for my life and as well as my sister's and my mother.
> Q: Who were you afraid of, Mr. Johnson?

---

[1] Although the witness repeatedly made clear that there were two shooters involved in the attack, *see* p. 7-8 *supra*, he only knew the name of one of them – Keith Ford. Resp. Exh. Z at L28. It was this man, a gang leader who "owned" the drug trade in his neighborhood, who the witness so greatly feared. *Id.* at L40-L41.

A: Keith Ford.
…
Q: Why did you give false testimony against… [Cal and Kirkman] at their criminal trial?
A: Again, you know, I was fearful of my life.
Resp. Exh. Z at L33 (emphasis added).[2]
...

Q: Do you remember making the statement identifying Kirkman and Cal as the persons that shot you a second time at the hospital to Detective Miller?
A: Yes, because by this time Mr. Keith Ford was adamant about what he would do to my people if I implicated him in any way, type of way, shape, form or fashion.
*Id.* at L53.

Thus, the trial court's determination that the witness' original identification ought to be accorded the enhanced reliability of a dying declaration (*Id.* at S6) was not reasonable – for a number of reasons. First and foremost, "[t]o make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death," *Shepard v. United States*, 290 U.S. 96, 99-100 (1933), such that a witness' uncertainty on this crucial point ("I didn't know whether I was going to die or not") is, as it were, fatal to designation of a statement as a dying designation. On the contrary, a witness must be absolutely convinced of his or her imminent demise for the statement to be accorded special reliability. *Id.* ("Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be a settled hopeless expectation… that death is near at hand, and what is said must have been spoken in the hush of its impending presence... The patient must have spoken with the consciousness of a swift and certain doom.") (internal citations omitted). Notably, too, the trial

---

[2] The trial court relied specifically on this exchange in making its dying declaration finding. ("Mr. Johnson testified on page 33 [of the evidentiary hearing transcript]…that he told the police he identified Mr. Kirkman and Mr. Cal because he thought he was going to die [sic] his family threated." *Id.* at S6.) Elsewhere in the evidentiary transcript, the witness refers to fearing death during the actual shooting – but not at the time he made the identification in question, which was hours later at the hospital. *See Id.* at L48.

record does not support the conclusion that the witness believed himself to be near death at the time of his hospital bed identification. Though his injuries were significant, the witness described being cogent and communicative with family even immediately after the shooting – directing their actions and their assistance of the other victims – and being asked by the responding paramedics if he could walk himself to the ambulance. Resp. Exh. B at B57. If this was his condition at the time of the actual shooting, it is hard to imagine that he felt himself facing "swift and certain" death hours later at the hospital, after having been sufficiently stabilized to see and talk with visitors. Relatedly, there certainly was no finding – or suggestion – at the original trial that the witness' hospital identification should be deemed a dying declaration.

Moreover, it is clear from the context of the statement that the witness' reference to his uncertain future was made to explain the urgency of his motivation to lie to investigators – being concerned about his ability to protect his family from the true perpetrator. In light of this clear record evidence it was unreasonable – and highly prejudicial – for the trial court to anoint the statement at issue with the near-infallible power of a dying declaration.[3]

---

[3] Interestingly, even though the Attorney General argues that the trial court's "dying declaration" analysis was a reasonable rubric under which to assess the reliability of the recantation, it appears that the trial court's main reason for focusing on the witness' statement that he "didn't know if he was going to die or not" was not so much the extent to which the court believed – erroneously – that this made his hospital identification akin to a dying declaration but that this statement was purportedly inconsistent with other statements made by the witness:

> "Mr. Johnson testified on page 33 in front of me on January 19, 2011, that he told the police he identified Mr. Kirkman and Mr. Cal because he thought he was going to die his family threatened [sic]. And certainly the State argues that that identification, when you think you're going to die, makes it reliable under a dying declaration theory of hearsay. And so the reliability of a person making the statement had they think [sic] that they going to die has been recognized inherently in or rules of evidence. However, on page 52, Mr. Johnson testified that he testified the way he did at trial because he wanted to take care of it on the street, is how I think he put it on page 52, which seems to be an opposite reason. Either you think you're not going to be here or you think you're going to take care of this on the street, I find that's contradictory." Resp. Exh. Z at S6-S7.

C. Clear and Convincing Record Evidence Establishes that the Recantation in this Case was not Based on Gang Allegiance.

Finally, with respect to the third and final basis that the Respondent identifies for the trial court's ruling – that the judge "assessed [the witness's]…credibility against his [gang] affiliation, Answer at 6 – this, too, is an attempt to rewrite and rehabilitate an unreasonable factual determination on the part of the state court. Because the state court did not, as the Respondent suggests, make a record-based finding regarding the gang affiliations or motivations of the people involved in this case. Instead, the state court disregarded unrebutted record evidence and, worse, advanced a "basis" for his seemingly predetermined theory of gang motivation that had no legitimate support in the record.

During the post-conviction evidentiary hearing, the recanting witness testified that his reason for coming forward with the truth was that his fear of the original perpetrator had abated in the nearly two decades that had passed since the crime, especially as he had moved hundreds of miles away. Resp. Exh. Z at L37. He also discussed his fear of the true perpetrator when the case went to trial and his efforts to escape falsely testifying against Mr. Cal and Mr. Kirkman by avoiding the trial entirely. *Id.* at L34. (The trial record reflects that a warrant had to be issued when the witness initially failed to appear at trial. Tr. R. C3-4.) The witness' motivations were accordingly explored in detail at the evidentiary hearing; he was asked, repeatedly, by both sides as well as by the court, for the reasons behind both his original testimony and his recantation. In fact, the witness was asked this question no less than six times (Resp. Exh. Z at L33, L34, L62, L65, L68, and L77) and each time he cited his fear of the true perpetrator. When asked – four

Here, again, the "inconsistency" cited by the trial court is no inconsistency at all – the two statements referred to by the court are only incompatible if the first statement is evidence that the witness believed himself to facing swift and certain death at the time he uttered it. But, as discussed above, the record makes clear that the witness believed no such thing.

times – why he initially identified Mr. Cal and Mr. Kirkman, each time he explained that he was afraid of naming the true perpetrator to the police.[4] When asked – two times, including an inquiry from the bench – his reasons for his recantation, he explained that his fear of the true shooter, nearly twenty years later, living halfway across the country, was greatly minimized, especially relative to the fear he felt for himself and his family during and after the trial, when they lived on the same block as the true perpetrator and at a known address. *Id.* at L68.

In addition, the witness testified that he had been "g[i]ve[n]…the green light to do the right thing" by a former gang leader, Ray Longstreet, who he trusted to protect him from the true shooter. *Id.* at L77. Specifically, the witness testified that he had a single contact with Mr. Longstreet – a phone call that lasted less than an minute (*Id.* at L78) – and that in addition to quelling his fears regarding the true shooter, Mr. Longstreet told him repeatedly to "tell the truth."

> Q [from the court]: …why aren't you afraid of Mr. Ford [the true perpetrator] now?
>
> A: Well, I'm glad you asked that. The talk I had with Mr. Ray Ray Longstreet, he's a well-known man in these streets, he had a lot of power, he still have a lot of power, and he told me that I had nothing to worry about, you know. Just get up there and do the right thing…
>
> Q: What did you understand by Mr. Longstreet telling you to do the right thing?
>
> A: What I understood from his was, you know, he was telling me, you know, no matter what, Main, 'cause that's what he called me at the time was Main, he told me just tell the truth, you know. If you know those guys didn't do it just step up

---

[4] The witness also provided great detail regarding the basis and effects of his fear of the true shooter – testimony that was corroborated by his girlfriend at the time. He testified that he and his family began to receive silent hang-up phone calls after the shooting, specifying that they received these calls at the hospital and at "Mama's Soul Food Restaurant," where his mother and sister worked. In addition to the threatening phone calls, the witness testified that his mother was being followed, and that strangers were inquiring at the restaurant as to his whereabouts. Indeed, the witness was so frightened that he told his girlfriend to tell those inquiring after him that he was dead. PC R. L33-35, L50, L62-32, L65-66, P43-46.

there and tell the truth. You don't have to worry about Keith Ford, you know. Things like that. Like I got your back. Just go up there and bottom line do the right thing and tell the truth, tell the honest to God truth…

*Id.* at L77-L78.

Nonetheless, based on the unimpeached testimony recounted above, the state court determined that the true subject of that one-minute call was a "gang loyalty" order to falsely exonerate Mr. Cal and Mr. Kirkman. *Id.* at S7. In fact, the trial court ruled that the witness "came forward for no other reason other than loyalty to" his former gang. *People v. Cal*, 2013 IL App (1st) 112354-U, ¶ 14; *see also* Resp. Exh. Z at S8. But there is nothing in the record to support this conclusion. On the contrary, the record indicates that Mr. Longstreet told the witness, repeatedly, to "just tell the truth." (Resp. Exh. Z at L77-L78).

The record further indicates that there was no "gang loyalty" connecting the witness to Mr. Cal and Mr. Kirkman – they were, in fact, "enem[ies]" in the drug war consuming their neighborhood at the time of the crime (*Id.* at L21-L22) and had not been in any kind of contact since. *Id.* at L20. In addition, there is nothing in the record indicating that Mr. Longstreet had any connection to Mr. Cal or Mr. Kirkman, let alone sufficient ties to support the trial court's theory that Mr. Longstreet, on a monitored prison phone call, suborned perjury on their behalf. Moreover, separate and apart from the factual flaws in this "gang loyalty" theory, there is a major logical shortcoming: if the witness was in such thrall to his former gang that, twenty years on, he would lie under oath to secure the release of the men who shot him – men he considered enemies, men he did not even know – why didn't such overriding loyalty prevent him from naming them in the first place? Finally, it is far from clear that Mr. Cal was in fact ever a

member of the witness' former gang – certainly, no evidence ever established that.[5] In fact, both Mr. Cal and Mr. Kirkman attempted to introduce evidence at the post-conviction hearing of their well known status as unaffiliated "neutrons" or "neutral parties" – via the recanting witness' own girlfriend at the time of the shooting. *See People v. Cal*, 2013 IL App (1st) 112353-U, ¶ 19. The court excluded this evidence as irrelevant.

Perhaps it is the case that the state court was unconsciously but unduly prejudiced by the recanting witness' candid revelation of his former gang membership, notwithstanding the lack of an evidentiary nexus between the witness' former affiliation and his recantation. *See, e.g., United States v. Irvin*, 87 F.3d 860, 866 (7th Cir. 1996) (regarding risk of undue prejudice of gang affiliation evidence). In any event, where, as here, the record is not only devoid of any gang loyalty evidence but also replete with unrebutted evidence providing an alternate motivation for a witness' testimony, to discredit that testimony based on speculation regarding the witness' "true" motivations, was not reasonable.

---

[5] The only reference made to Mr. Cal's possible gang affiliation in the post-conviction record is this exchange from the recanting witness' cross examination:

> Q: You testified earlier you were upset about Mr. Kirkman and Cal working with Keith Ford because they were Vice Lords and Keith Ford was a disciple, correct?
> A: Correct

Resp. Exh. Z at L80-81. But the witness did not, in fact, "testif[y] earlier" to anything of the sort regarding Mr. Cal – there is no evidence in the record, from the recanting witness or any other, indicating that Mr. Cal was affiliated with any gang, let alone the gang to which the recanting witness once belonged. On the contrary, as discussed above, Mr. Cal tried to introduce evidence of his status as an unaffiliated "neutron" but this evidence was excluded by the trial court as irrelevant.

III. Where the Trial Testimony and Recantation, When Taken Together, Expose the Fundamental Unreliability of the Trial Proceedings, Mr. Cal's Conviction and Incarceration Violate Due Process.

Respondent answers Mr. Cal's second argument – a claim that his right to due process of law was violated by his conviction and incarceration – by contending that it disguises his innocence claim as a challenge to the sufficiency of the evidence. It is Respondent that is misdirecting this Court by failing to acknowledge and address the substance of Mr. Cal's due process claim. Cedric Cal's continued incarceration constitutes a due process violation because his conviction rests solely on unreliable evidence – namely, the testimony of an individual who, as Respondent readily acknowledges, has lied under oath about the sum and substance of the inculpatory evidence against Mr. Cal. And Mr. Cal remains imprisoned based on that evidence and nothing else. "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503 (1976) (citing *Drope v. Missouri*, 420 U.S. 162, 172 (1975)); *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial"). The requirement of due process aims to prevent fundamental unfairness in the use of evidence. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see United States v. Lovasco*, 431 U.S. 783, 790 (1977) (the court's task is to determine if the action complained of violates "conceptions of justice which lie at the base of our civil and political institutions" and "which define 'the community's sense of fair play and decency'") (citations omitted). To the extent that Respondent fails to address the substance of Cal's claims, Petitioner stands on the arguments contained in his Memorandum in Support of Petition for Writ of Habeas Corpus.

Moreover, Respondent's straw man attempt to reframe Petitioner's due process argument should be rejected. According to the Attorney General, Mr. Cal's contention is, "even if Johnson's recantation were *false*, his conviction would still be unconstitutional because the recantation shows retrospectively that Johnson is an unreliable witness." Answer at 8 (emphasis in original). Petitioner's due process challenge is not based on the suggestion that a provably false recantation, injected into proceedings years after trial, could create a constitutionally infirm conviction. Such a suggestion is untenable and patently unreasonable. And no such claim is being made here. Notably, in securing a perjury conviction for Johnson, the State did not claim to know – let alone marshal any quantum of proof or admission from Johnson – which statement (*i.e.*, trial or collateral) was false. *Johnson*, 11 CR 13172-01; *See, e.g., People v. Ricker*, 45 Ill.2d 562, 565 (1970) ("Proof that a person has made contradictory statements proves of itself, without aid of any presumption, that the person has made a false statement"). Even if this Court were to reject Argument I, all parties remain in agreement on this critical fact – Mr. Cal's conviction and sentence rests on the testimony of a perjured witness. To be sure, Mr. Cal's due process claim is grounded in the principle that, when new information or subsequent proceedings reveal fundamental flaws in the trial process, a new trial warranted. *See, e.g.* John Schuppe, "Epic Drug Lab Scandal Results in More than 20,000 Convictions Dropped," *available at* https://www.nbcnews.com/news/us-news/epic-drug-lab-scandal-results-more-20-000-convictions-dropped-n747891 (last accessed 9/14/18); *U.S. v. Ciavarella*, 716 F.3d 705 (3rd Cir. 2013) (detailing subsequent criminal prosecution of judges alleged to have received $2.8 million for helping to construct and operate juvenile detention centers and placing juvenile offenders there exchange), *see also* Associated Press, "Court Tosses Convictions of Corrupt Judge), https://www.cbsnews.com/news/court-tosses-convictions-of-corrupt-judge/ (last accessed

9/14/18); *cf. People v. Sanchez*, 329 Ill.App.3d 59 (1st Dist. 2002) (defendant entitled to

supplement appellate record with Attorney Registration and Disciplinary Commission (ARDC)

proceeding against defense counsel conducted after defendant's trial: ARDC record revealed

previously undisclosed level of addiction and illness dating back to defendant's trial that could

have compromised attorney's professional abilities, there was no evidence that defendant or trial

court was aware of information, and appellate court could not predict what impact information

might have had on defendant's decision to retain attorney or decision of trial court to allow

defendant to do so in spite of obvious conflict). Here, Petitioner's conviction violates due process

not because Johnson's recantation should be believed or that "standing alone" it rises to the level

of a constitutional violation, but because Cal's conviction and 60-year sentence rests on the

unreliable testimony of an admitted liar. Thus, in the absence of any other evidence against

Cedric Cal, due process and justice both demand that he receive a new trial.

IV.     Should This Court Dismiss the Petition, Reasonable Jurists Could Debate the
        Denial of Cedric Cal's Constitutional Rights and Therefore a Certificate of
        Appealability Should be Issued.

        If this Court chooses to dismiss Mr. Cal's petition, a certificate of appealability ("COA")

should be issued. COAs should be issued when the "applicant has made a substantial showing of

the denial of a constitutional right," 28 U.S.C § 2253(c)(2), or, similarly, when "jurists of reason

would find it debatable whether the petition states a valid claim." *Slack v. McDaniel*, 529 U.S.

473, 484 (2000). Further, the Seventh Circuit has held that "[m]any prisoners who seem likely to

lose in the court of appeals nonetheless are entitled to certificates of appealability under the

statutory standard; meritorious appeals are a subset of those in which a certificate should issue."

*Thomas v. United States*, 328 F.3d 305, 308 (7th Cir. 2003). Therefore, a COA only "requires an

overview of the claims in the habeas petition and a general assessment of their merits," as

opposed to a "showing that the appeal will succeed." *Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003). Cedric Cal has demonstrated that he has made a substantial showing of the denial of the constitutional right and therefore a COA should be issued.

## CONCLUSION

For the foregoing reasons, and those described in the Amended Petition for Writ of Habeas Corpus and Memorandum, Petitioner Cedric Cal respectfully requests that this Court grant his petition, vacate his conviction, and order the state court to retry him within 60 days or release him. In the alternative, Petitioner requests and evidentiary hearing before this Court so that any additional factual record may be developed in order to determine *de novo* whether Petitioner's constitutional claims have merit.

Respectfully Submitted,

*Attorney for Cedric Cal*

Dated:

September 14, 2018

Shobha L. Mahadev, ARDC No. 6270204
Alison R. Flaum, ARDC No. 6242891
Scott F. Main, ARDC No. 6275419
Children and Family Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576